PARADISE, LAWRASON & Co. *v.* SUN MUTUAL INSURANCE CO.
THE SAME *v.* THE NEW ORLEANS INSURANCE CO.
THE SAME *v.* NASHVILLE MARINE AND FIRE INSURANCE CO.

In an action on a policy of insurance, where the defence is, that the loss was occasioned by the barratry of the master, he is a competent witness for the plaintiff. The objection goes only to his credibility.

The question of whether a witness would believe another witness, who had testified, on oath, cannot be put, unless a knowledge of the general reputation of the witness sought to be discredited, is first proved by the witness interrogated.

Testimony of previous statements of a witness, different from his testimony, cannot be introduced, without having given the witness an opportunity of accounting for the contradiction between his previous statements and his testimony.

Where A. B. & Co. have effected an insurance in their own name, for the benefit of whom it may concern, and it appears to have been their intention to have insured for the benefit of another person, they will not be allowed to recover on the policy in their own right, although they may have become interested, by assignment, in the property insured.

The assignee of a policy of insurance, takes only the rights of the assignor; and cannot escape the consequences of a defence of barratry, which would have prevailed against the assignor.

Where, from the circumstances of the case, a policy is indivisible, and there is a good defence against one of the parties interested in it, the other cannot recover on it.

Where the owner of a vessel, who has himself supplied the cargo, effects an insurance upon freight, in case of loss, he can recover, not the profits he might have made, but the usual and reasonable rate of freight for the voyage at the port of departure.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge*, J. *J. Finney*, *C. Roselius* and *R. Hunt*, for plaintiffs. *Benjamin* and *Micou*,

*Grymes* and *Maybin*, for defendants. The judgment of the court was pronounced by

SLIDELL, J. The above-mentioned suits, which, by consent of parties, were tried together before a jury, are on three policies of insurance, executed by the defendants in favor of *Paradise, Lawrason & Co.*, " on account of whom it may concern." One by the Sun office, to the amount of $15,000, on freight of the ship Russia; another by the New Orleans office, on said freight, to the amount of $7000; a third by the Nashville office, on the ship Russia, to the amount of $12,000. The perils taken upon themselves by the underwriters are, among others, " barratry (except embezzlement or theft) of the master, unless the insured be an owner of the vessel."

There was a verdict for the plaintiffs in the court below, for the full amount of each policy. A new trial was refused by the district judge, and the defendants have appealed. The ship and cargo were destroyed by fire after the inception of the voyage. The principal ground of defence urged in argument is, that the Russia was barratrously set on fire by the captain; and so the defendants are discharged, the policy excluding the liability of the underwriters for barratry of the master, if the insured be owner of the vessel. Much of the argument was also directed to impeaching the good faith of *Knapp*, the owner of the Russia.

Before noticing the merits of the cause, it is proper to act upon certain bills of exception, taken by the defendants, to the admission of evidence. The first bill of exceptions is, to the competency of *Wilson*, the captain of the ship, " on the ground of interest, inasmuch as the defence rests on the charge of barratry and deviation against the said witness, while acting as master of said ship Russia; whereof the owner, *Knapp*, is a party in interest with the plaintiff herein." The authorities upon which the defendants rely to support this bill are, 2 Starkie, 652, Edit. 1837, citing two decisions of Lord Kenyon in 1 Esp. 339, and 6 Esp. 27. 1 Greenleaf on Evidence, 439. 5 Bos. and P. 374. 13 L. R. 213. Some other cases are cited, which seem not sufficiently relevant to require particular notice.

The doctrine enunciated in *Nicholson* v. *Patton*, 13 L. R. goes to this extent, that an agent cannot be a witness for his principal, in an action brought against his principal on account of the negligence of the agent. The case in 1 Espinasse, was an action to recover the loss on a policy of insurance on ship and goods, at and from the Bahama islands to Liverpool. The loss was charged to have occurred by barratry of the captain, for which risk the underwriter was liable. The barratry alleged consisted in taking the ship out of her course to chase and capture vessels, and afterwards to Bermuda, where she was lost. The underwriter, the defendant in the cause, called the captain as a witness, to prove that this was done by the consent and with the knowledge of the owners. It was held, that he was incompetent, without a release from the underwriter, upon the ground that he was interested to defeat the plaintiff. If the plaintiff obtained a verdict, the defendant might have his action against the captain, the loss having arisen from barratry, which was his act.

The case in 6 Esp. we have not been able to refer to. In the paragraph of Mr. Greenleaf's work above cited, he speaks, among other cases, of the incompetency of a shipmaster, in an action by his owner against underwriters, where the question is, whether there has been a deviation; and says, he is incompetent to give testimony, the direct legal effect of which will be, to place himself in a situation of entire security against a subsequent action. He cites the case of

*Dr. Simonds* v. *De La Com.* 5. Bos. and Pul. The opinion of Chief Justice Mansfield upon the point, is an *obiter dictum.*

It seems to us, that the question to be examined, in testing the competency of captain *Wilson*, is, whether it be true that the success of the plaintiff, who offered him as a witness, would place him in a situation of security against a future action. Now, this question must necessarily be answered in the negative. For although, if the plaintiff succeeds, he will have no action against the captain, yet the defendant would not be estopped by the judgment in this cause from proceeding against the captain, and recovering from him a full indemnity for the amount paid under judgment to the plaintiff, upon proving that the captain had barratrously destroyed the vessel. Whatever, therefore, be the result of the cause, the door of litigation against the captain remains open.

There is another view of this matter, which seems to us important, and that is, the necessity of the case, where the loss occurs at sea. To whom can the assured resort, for proof of the circumstances of the vessel's navigation and loss upon the ocean, but to those on board of her, who are his own employees ? And if we exclude the captain, we exclude the person, of all others on board, who by reason of his nautical skill, the control he exercises, and the nature of his duties generally, is to be supposed best capable of giving accurate information upon the subject of the voyage. We may add, that under the usages of commerce, the testimony of the captain, on the subject of the loss, in the form of a protest, is uniformly required from the owner by the underwriter, as preliminary proof; and there seems an inconsistency, in refusing to hear him afterwards on the witness stand. We are therefore of opinion, that the district court did not err, in permitting *Wilson* to testify as a witness for the plaintiffs. See also the opinion, upon the same point, of the Supreme Court of Ohio, in *Howell* v. *Cin. Ins. Co.* 7 Hammond, 283. We have considered this question of competency, with reference to the pecuniary interest of *Wilson*, which is the sole light in which the matter is to be regarded, in acting upon the bill of exception. So far as his feelings and reputation are concerned, he is unquestionably interested in the success of the plaintiffs. A cloud is cast upon his character, which a verdict for the plaintiffs might dissipate. But this consideration goes only to his credibility.

The next bill of exceptions is in these words : " Be it known, that on the trial of this cause, the counsel for the plaintiffs asked several of the witnesses, whether they would believe on oath *Eliza Harris, Josephine Chambers* and *Margaret Ross*, witnesses for the defence. The counsel for defendants objected to the question, on the ground that the opinion of a witness, as to the credibility of another, was inadmissible ; that it allowed the witness to usurp the functions of the jury ; that it was the introduction of a collateral issue, rendering necessary the summoning of a fresh array of witnesses, whose opinions might, in turn, be attacked and defended ; that it was allowing vent, in a court of justice, for feelings of personal spite and malice, was not an inquiry of fact, and was subversive of the good order of judicial proceedings. But the court overruled the objection, allowing the question, &c."

It will be observed, that the bill of exceptions does not show, that the question was put without previous inquiry, touching the general reputation of the persons in question. Where these preliminary inquiries have been made, we have no doubt, that the question we are considering may be put. It is not to be supposed, that jurymen are personally acquainted with the character of all the witnesses that come before them ; and when they are called to find out the truth, by means of the testimony presented to them, it is indispensable, for the

purposes of truth, that they should know how far portions of that testimony
are entitled to credence. The inconvenience suggested, is a serious one ; but the
exclusion of necessary information from the jury, would be a much greater evil.

The next bill of exceptions is in these words : "Be it known, that on the trial
of this cause, the counsel for the plaintiffs offered in evidence the testimony.
of *Charles Redfield*, as taken under commission, and annexed to, and made
part of, this bill of exceptions, for the purpose of attacking the testimony, and
impeaching the credibility, of the witness *Dunlap*, by showing that he had made
to said *Redfield*, statements of the facts relating to the loss of the Russia,
different from those by him made on the trial ; to the introduction of which
testimony, the counsel for defendants objected, on the ground that this mode
of attacking and impeaching the credibility of a witness, was inadmissible, unless
the witness thus attacked had been himself interrogated, as to the facts of his
making such contradictory statements, and an opportunity given him of accoun-
ting for the contradiction. But the objection was overruled, and the evidence
admitted, &c." We think, the objection should have been sustained. See the
Queen's case, 2 Brod. and Bing, 313. Greenleaf on Evid. § 462. *Fletcher* v.
*Fletcher*, 5th Ann. 408.

The fifth bill of exceptions was taken to the admission, in evidence, of certain
documents, being a power of attorney given by *Knapp* to *Paradise, Lawrason
& Co.*, an assignment of the freight list of the Russia, certain acceptances, &c.,
which will be noticed more particularly hereafter, upon the ground of irrelevancy
to the issue, and inadmissibility under the pleadings. We think, the objection
was properly overruled.

*Paradise, Lawrason & Co.*, in their petition, say, that they sue on their own
account, and for the use of *Frederic H. Knapp*. They allege, the execution
of the policy by the defendants, on the freight of the Russia, and that they were,
at the time of its execution, and from thence, until and at the time of the loss,
interested in the freight, to an amount of $25,280 77. That *Knapp* was at said
date, and thence, until the time of the loss, the owner of the Russia, and of the
freight, and interested therein, subject, nevertheless, to the interest of *Paradise,
Lawrason & Co.*; and the insurance was effected for their own use, to the extent
of their said interest, and for the remainder, for the use and benefit of *Knapp*,
by whom they, *Paradise, Lawrason & Co.*, were duly authorized to act in the
premises.

The plaintiffs contended, in the court below, and here, that if the ship was
destroyed by the barratry of the master, it did not affect the right to recover, so
far as their interest was concerned, but was only available to the underwriters
*quoad* the interest of *Knapp*.

On the other hand, it is contended by the defendants : First, that *Paradise,
Lawrason & Co.* are not insured by the policy ; and this proposition they rest
upon two grounds : first, that *Paradise, Lawrason & Co.* had no insurable inter-
est in freight, which is the subject of the policy ; secondly, that even if they
had an insurable interest in freight, they did not insure themselves in point of fact.
They also contend, that even if they are insured, under the circumstances of the
case, and the terms of the policy, for their own interest, they cannot recover,
unless *Knapp* could, because the policy is indivisible. Before considering
this proposition, it is necessary to notice the relations which existed between
*Paradise, Lawrason & Co.* and *Knapp*, before and at the date of the policy.

In 1849, at which time there was great excitement on the subject of Califor-
nia, attracting thither crowds of emigrants, and exciting, also, in an extraordi-

nary degree, a spirit of mercantile adventure, the plaintiffs and *Dr. Knapp* became jointly interested in the ship Dalmatia; and despatched her to California, on joint account, in the month of October. *Knapp* and the plaintiff also shipped cargo in her, for joint account. In November, he purchased the Russia at the price of $16,000; paying $9000 in cash, and the residue in his note at ten months. In the same month, *Paradise, Lawrason & Co.* accepted, for his accommodation, his seven bills, for a total sum of $19,000, at ten months; and, in the following January, they accepted, in like manner, for him, another bill for $5000. At the date of these nine acceptances, a written contract was signed by *Knapp* and *Paradise, Lawrason & Co.*, in which, after reciting their acceptance for his accommodation, and their understanding, that he was to furnish *Paradise, Lawrason & Co.* the means of taking them up at maturity; he, to secure them, assigns to them his half interest in the freight list of the Dalmatia, then on her voyage to California; his half interest in all goods shipped per the Dalmatia, on joint account, and in their proceeds, and all his interest in all policies taken out by *Paradise, Lawrason & Co.*, for joint account, on the Dalmatia, her freight and cargo. "Also, the freight list of the ship Russia, about to sail from this port to San Francisco, California; also, all my interest in and to all policies of insurance to be taken out on the said ship Russia, her freight list, proceeds of cargo, if any should be shipped on her, on my own account," &c. All which proceeds, or the balance thereof, "after paying the said drafts, are to be paid over to me by the said *Paradise, Lawrason & Co.*, who hereby accept this assignment, with its conditions, by signing the same."

On the same day, *Knapp* executed, in favor of *Paradise, Lawrason & Co.*, an instrument, by which he constitutes them his agents, to act for him in all mercantile transactions in California, which may arise out of any shipments of goods already made, or to be made to that country; to dispose of the goods and collect proceeds; to collect freights of any vessel he may consign to them there; and, generally, to manage and protect his business and interests in California. In consideration of the mercantile services of his agents, he agrees to pay them ten per cent on the whole of the freight list of the Dalmatia, excluding property shipped on joint account; on proceeds of stores and articles shipped on board the Dalmatia, on joint account, if sold, ten per cent; on proceeds of the Dalmatia, if sold, five per cent. He also agreed to pay the usual commissions charged in New Orleans, on the entire freight list of the Russia, then being loaded and consigned to *Paradise, Lawrason & Co.*, in the port of New Orleans, as well as on the whole cargo, including that which might be shipped by him on his own account; the Russia to be consigned to *Paradise, Lawrason & Co.*, or their substitutes, at San Francisco. It was further stipulated, that in case of loss, or partial loss, of either the Dalmatia or the Russia, *Paradise, Lawrason & Co.* were to be paid "five per cent for settling insurance, according to custom."

On the 24th January, 1850, a notarial act was signed by *Knapp* and *Paradise, Lawrason & Co.*, in which he acknowledges, that they have accepted, for his accommodation, his bill for $5000, at nine months from the 22d of January, and that he is to furnish means to take it up at maturity. He refers to the agreement of the 27th of November; and places this bill "in the same position as the seven others, by which the said acceptors will be secured by the assignment and sureties, contained and set forth in the said private agreement."

The policies in these cases were, as we have already said, in the name of *Paradise, Lawrason & Co.*, "for account of whom it may concern," on ship and freight, to the amount of $34,000. There were two other policies on

<div style="text-align: right">

</div>

freight in the Tennessee office, for a total amount of $20,000. On the 1st of February, the plaintiffs addressed a letter to their New York correspondent, desiring him to effect insurance on merchandise, for account of *F. H. Knapp,* loss, if any, payable to *Paradise, Lawrason & Co.,* to amount of $25,000. The vessel sailed on the 5th, and was lost on the 7th of February. The acceptances were taken up at maturity by the plaintiffs. During the lading of the Russia, the plaintiffs, as *Knapp's* agents, made cash advances, in the ship's business, to the amount of $2000 and upwards. In the account of *Knapp* with the plaintiffs, they charge him the premiums paid for insurance, and credit him with the amount of $15,000 received on compromise from the Tennessee office, on the 15th May, 1850.

It thus appears, that *Paradise, Lawrason & Co.* had come under heavy advances of their credit and cash, upon the faith of the expected freight list, of which a formal assignment was made to them for the purpose of securing them; and which freight, as assignees, as well as in their capacity of agents and consignees, they had authority to control and collect. As such assignees for a valuable consideration, their interest subsisting at the date of the policy, and down to the time of the loss, they must be considered as having an insurable interest in the freight, the subject matter of the insurance.

We incline to the opinion, that a policy on freight, *eo nomine,* may be considered as covering such an interest as is above described, although the question is not, perhaps, free from difficulty, as *Paradise, Lawrason & Co.* did not hold either the legal or equitable title of the ship. But assuming that the interest of *Paradise, Lawrason & Co.* in the freight might be covered by an insurance on freight *eo nomine,* the question remains, whether that interest was in point of fact covered by these policies; and this question must be determined by ascertaining their intention.

At the argument, we had doubts whether this point of the defence could be maintained; but we are of opinion, from our subsequent examination of the evidence in the cause, that it was not their intention to insure their own interest, but the interest of *Knapp.* We consider this as resulting from the fair interpretation of the terms of the assignment, which contemplated that they should effect insurance for him, and hold the policies so to be effected, for their security, collecting the amounts insured, in case of loss, and crediting it to him in account, when collected; from the stipulation in the power of attorney, allowing them five per cent for collecting the policies; from the fact, that they have charged him with the entire premiums of insurance, and credited him with the whole amount collected; from the language of their letter of the 1st February, 1850, ordering insurance on cargo "for account of *Knapp,* loss, if any, payable to *Paradise, Lawrason & Co.;*" which cargo, under the written agreement, stood on the same footing of assignment and security as the freight list. Some of these facts standing isolated and alone, might not, perhaps, suffice to establish the intention of the plaintiffs. But all the evidence construed together, justifies the conclusion, that the policies were intended to cover *Knapp's* interest, and, as such, to be held by *Paradise, Lawrason & Co.,* for their security under the assignment. *Knapp,* therefore, must be regarded as the assured, and *Paradise, Lawrason & Co.* as the assignees of the assured. As such assignees, they take his right under the policies, and cannot be permitted to escape from the liability of barratry, upon the ground that they had insured their own interest, and were not the owners of the vessel.

But even if the policy were intended by the assured, as the plaintiffs themselves allege, to cover the interests both of *Knapp* and of themselves, and does by its terms cover them, still the policy, under the circumstances of the case, is indivisible; and if, by reason of the exception, *Knapp* could not recover in case of barratry by the master, the plaintiffs cannot recover, even to the extent of their interest. The defence of barratry, if good against *Knapp*, is good against them.

In construing a contract of insurance, we are construing a contract *uberrimæ fidei*. In giving *Paradise, Lawrason & Co.* a policy on freight, the underwriter had just reason to suppose, in the absence of explanation, that he was dealing with the owners of the vessel, or at least with parties closely associated in interest with the owner; and if so, the assured by the terms of the policy was, in the contemplation of the underwriter, agreeing to take upon himself the risk of loss by barratry of the master. We do not think that this view of the case conflicts with the general doctrine, that the special nature of the interest need not be disclosed where the subject matter of the insurance is properly described, or, at all events, that it is more than a reasonable and fair limitation of that doctrine. The reason, or certainly one of the reasons, of that doctrine is, that in general the nature of the title or interest of the assured, whether legal or equitable, absolute or partial, is without influence on the general risks of the policy, the perils of the sea, seizure, capture, etc. Moreover, the payment of the loss to the plaintiffs enures as certainly to the benefit of *Knapp*, as a payment to himself. For they, under their contract, are bound immediately to apply the proceeds of the policy to the satisfaction of their advances. So that, in substance, if the loss was by barratry, *Knapp* recovers for a loss for which he had agreed to ask no indemnity.

We, therefore, do not concur with the learned judge in his charge, that if the jury were of opinion that *Paradise, Lawrason & Co.* had, in their own right, an insurable interest, and insured that interest on their own account, they can recover; and that the clause, concerning the barratry of the master, excepts only the case where the assured is owner of the subject insured. We think the charge should have been, that if the jury believed the policy was effected, as alleged by petitioners, to cover the interests of *Paradise, Lawrason & Co.*, and of *Knapp*, the exception concerning barratry applied alike to both; and that, if the loss was by barratry of the captain, neither could recover.

The defendants asked the court to charge the jury, "that freight upon owners' goods, although insurable as and under the denomination of freight, yet the amount of such freight is to be measured by the additional value given to such goods, by the transportation of them from the port of departure to the port of destination, to be calculated on the value at the port of departure." The court refused so to charge; but told the jury, that the value, or interest, depends on the rate of freight at the port of departure; and the merchant, in apportioning it, is bound, in fairness, to fix it at that rate which was then the fair and market rate of freight, at the time of loading the cargo; for that, he charged the jury, was the measure of the interest which the shipowner had, under the policy on freight.

The term, *freight*, said Lord Tenterden, as used in policies of insurance, means the benefit derived to the shipowner from the employment of the ship. It is the same thing, he observed, to the shipowner, whether he receives that benefit of the use of his ship, by a money payment, from one person who charters the whole ship, or from various persons who put specific quantities of goods

on board, or from persons who pay him the value of his own goods at the port of delivery, increased by their carriage in his own ship. The assured may fairly consider that additional value as freight, and so term it in the policy. *Flint* v. *Fleming.* 1 Barn. and Adolphus, 45. Mr. Arnould, in his very valuable treatise, after citing this opinion of Lord Tenterden, adds: "Accordingly, it is now established law in this country that the assured, under a general insurance on freight, may recover the profits he expects to make by carrying his own goods in his own ship on the voyage insured." Arnould on Ins., p. 221. And Mr. Phillips uses the following language: "Where the owner of the ship is also the owner of the cargo, a policy on freight will cover the interest arising on the transportation of the cargo. In such case, the profits of the voyage, says the Supreme Court of Massachusetts, may be insured under the denomination of freight." 1 Phillips, 197. Upon this expression, *profits*, used by the commentators, and found in some of the decisions, the learned counsel for the defendants base the argument, that the claim of the assured, in this case, for loss of freight, so far as his own goods are concerned, must be controlled by the inquiry, what would have been the enhanced value of *Knapp's* goods at San Francisco? We think, the argument gives an undue weight to an incidental expression; and does not comport with the true theory upon which the doctrine (above stated in the language of Lord Tenterden) rests, or with the mode in which it has been applied in practice. Freight is the price of the carriage of the cargo; and is the shipowner's compensation for the employment of the ship, his return for the labor and capital which he employs in the purposes of commerce. If he carries a cargo belonging to another person, he receives his compensation in the price paid by that person for the carriage. If he carries his own cargo, he may be fairly considered as charging the price of the carriage to the goods, and crediting the ship in account; expecting the goods to reimburse their outlay, upon their sale at the port of destination. The argument, on the part of the defendants, confounds the freight of the shipowner's goods, that is, the price or expense of their carriage, with the profits on those goods at the port of destination. But those profits depend upon many circumstances, independent of the home value of the goods and the costs of transportation. They depend, as was properly argued for the plaintiffs, on the favorableness or unfavorableness of the foreign market when the goods reach there; which is not controlled merely by the home value and the cost of transportation, but by the proportion of demand and supply in that market, the prosperity or embarrassment of commercial affairs; in short, a variety of circumstances, independent of the home value and freight. Both these have their value; yet the profits may be much, or nothing. In practice, the mode of calculating the loss, suggested by the defendants, has not been followed; and so far as our researches have gone, it has never even been contended for.

In the case of *Flint* v. *Fleming*, the policy was on freight, on the ship Hope, at and from Madras to London. On the arrival of the ship at Madras, the crew were employed some days in discharging the outward cargo; and then, the vessel was lost in the Madras roads, by the perils of the sea. No part of the cargo was then shipped; but the captain had purchased at Madras, by order and on account of the plaintiff, his owner, twenty-five tons of red wood. A commercial house had contracted to ship 122 tons of saltpetre; another person engaged to ship ninety tons of light goods; but as to those goods, there was no contract in writing. There was a verdict for the plaintiff. For what? The amount of the freight of all the goods. A motion being made for a new trial, Lord Tenterden, after the observations respecting freight of owner's goods, which we have

already cited, then notices the deficiency of proof, as to the light goods, and says the underwriters must have a new trial, upon that ground. "But," he remarks, "he must, at all events, have a verdict against him for the amount of the freight on the red wood and saltpetre. It would, therefore, be advisable for the defendant to pay to the plaintiff, the costs of this action and the freight of the red wood and the saltpetre, and that he should undertake to pay the freight of the light goods, if, on reference to an arbitrator, it shall be found that there was a contract to ship those goods." Accordingly, by the reporter's statement, at the foot of the case, it appears, that the underwriter agreed to pay the costs of the action, and the freight of the red wood and saltpetre, and refer the other matter to arbitration.

By examining the opinions of Bayley, J., and Parke, J., in that case, it will be seen, that they, in substance, understood, by freight of the shipowner's goods, the expense of their carriage. So, in *Devaux* v. *J. Anson*, the idea of estimating the loss, with reference to the profits which would have been realized, is no where hinted at in the evidence or the argument of the case, although, we observe, there was evidence to show what freight the assured had to pay to another vessel, after his own was lost. The argument of Sir William Follett, for the underwriter, seems to concede, that freight of owner's goods and that of goods belonging to third persons, stand on the same footing. It is true, however, that the policy on freight, in that case, was a valued policy. It is proper to add, that the standard of freight, according to the usual and reasonable rate at the port of departure, is recommended by the consideration, that it is something appreciable by both parties at the time of the contract. The other theory leaves matters afloat, to be afterwards controlled by distant and unforeseen contingencies.

When we speak of the usual and reasonable rate of freight at the port of departure, we must be understood, as contemplating the rate which could, in the ordinary and legitimate course of business, be obtained by the shipowner from others, for goods of like nature. Because the owner might find shippers, who would contract to pay him $50 per ton for the carriage of iron, or hardware, to California, does it follow, that he can properly estimate the freight on bricks, shipped by himself, at that rate? Putting freight on bricks at $55 per ton, as is charged in the ship Russia's freight list, on bricks shipped by her owner, makes the freight at the rate of about $137 a thousand. Could a third person be found, who would have shipped bricks in the Russia, and contracted to pay that price for their carriage? A witness for the plaintiffs, on his cross-examination, says: "he never knew any shipper on his own account to buy bricks here at nine dollars to twelve dollars a thousand, and pay freight for them at the rate of $137 50 per thousand, payable here, or at San Francisco." A witness for the defendants, says: "I consider it madness to make such a shipment." Advices from California, bearing date 31st October, 1849, and received by a merchant in New Orleans, on the 18th December, 1849, quoted bricks, as worth there, forty dollars a thousand.

We have thus given our opinion upon the prominent questions of law, presented in this case. Our inability to agree, upon two important points, with the ruling of the learned judge of the district court, is, perhaps, a sufficient reason for acceding to the application for a new trial, which has been earnestly pressed by the defendants. But there is an additional ground for sustaining this application. Upon the substantial merits of the case, our minds are not satisfied to affirm the judgment.

<div style="text-align: right; font-style: italic;">PARADISE<br>v.<br>SUN MUTUAL<br>INS. COMPANY.</div>

The painful impression, that the conflagration of the Russia was not accidental, which rested upon the mind of every member of this court, at the close of the elaborate arguments of counsel upon the facts of this case, has not been removed by a subsequent examination of the evidence.

As this matter is to undergo further investigation, it is not necessary that we should comment, at length, upon the evidence. It is proper, however, that we should state the principal points of difficulty which our minds have encountered in the consideration of this cause.

The vessel, after an interval of about fifty hours from her departure from the South West Pass, was destroyed by fire, at a distance of a few miles from that place. Was her position the consequence of adverse winds and currents, and the sailing qualities of the vessel, or was it the result of design? What progress had the conflagration made, when the officers and crew abandoned her? Could assistance have been rendered to save the vessel and cargo? Was it asked? Does *Payson* tell the truth, in saying that the captain told him there were ten or twelve barrels of powder on board ; and *Snow*, in his assertion, that no attempt was made by the towboats to put out the fire, on account of the report about powder? Was cargo for the owner's account, to the extent asserted, on board the vessel at the time of her destruction? Is the showing of the freight list in the ordinary course of business? Was there over-insurance, actual or supposed? Did the asserted conversation of the captain with his paramour, before the loss, really take place?

These points of inquiry are not all of equal importance or equal difficulty ; but they all have, in a greater or less degree, a material bearing upon the grave questions of accident or design, of fraud or good faith.

It is therefore decreed, that the judgments of the district court be reversed, and that these causes be remanded for a new trial according to law; the costs of the appeal to be paid by the plaintiffs and appellees.